United States District Court
Southern District of Texas
**ENTERED**
December 17, 2021
Nathan Ochsner, Clerk

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**VICTORIA DIVISION**

| | | |
|---|---|---|
| **CENTRAL MUTUAL INSURANCE COMPANY,** | § | |
| **Plaintiff,** | § | |
| **v.** | § | **Civil Action No. 6:19-CV-00065** |
| **MARY ANN DAVIS dba PAST TIMES,** | § | |
| **Defendant.** | § | |

| | | |
|---|---|---|
| **MARY ANN DAVIS,** | § | |
| **Plaintiff,** | § | |
| **v.** | § | **Civil Action No. 6:19-CV-00086** |
| **CENTRAL MUTUAL INSURANCE COMPANY,** | § | |
| **Defendant.** | § | |

**MEMORANDUM OPINION AND ORDER**

This declaratory judgment action was brought by an insurer, Central Mutual Insurance Company ("Central"), to determine its obligations under a policy held by Mary Ann Davis. Davis is the sole proprietor of Past Times, a needlepoint shop, and Rio Grande Royalties, an oil and gas landman operation. Davis also owns a corporation called Upland Energy. Under the name "Mary Ann Davis DBA Past Times," she purchased an insurance policy (the "Policy") from Central to cover the building she uses for commercial operations and business property. After Hurricane Harvey, Davis filed an insurance claim which included: (1) damages to property used for Rio Grande

Royalties, (2) a three-year internet and phone subscription service for "Mary Ann Davis—Upland Energy," (3) building restoration work amounting to $145,987.49, and (4) legal expenses related to the restoration work. Central disputes liability on these items and has brought a declaratory judgment action seeking clarification of its obligations under the Policy. The Parties have filed competing Motions for Summary Judgment with respect to Central's liability. For the following reasons, the Court **GRANTS IN PART** Central's Motion and **DENIES** Davis's Motion.

## I. BACKGROUND

Central is an insurance company incorporated in and with its principal place of business in Ohio. (Dkt. No. 1 at ¶ 1).[1] Davis, domiciled in Texas, is the sole proprietor of Past Times, a needlepoint shop operating out of a building located at 105 Santa Rosa, Victoria, Texas 77901 (the "Santa Rosa Building"). (*Id.* at ¶¶ 2, 5–6); (Dkt. No. 22 at 2). Davis apparently has two other businesses operating out of the Santa Rosa Building: Rio Grande Royalties and Upland Energy. (Dkt. No. 22 at 2, 7). Central issued an insurance Policy to "Mary Ann Davis DBA Past Times" for the Santa Rosa Building and the property within it. (Dkt. No. 1 at ¶ 5). Central alleges that the Policy describes Past Times as a "gift shop" and "retail nick nak store." (*Id.* at ¶ 6).

On August 28, 2017, Davis filed an insurance claim for damages to the property caused by Hurricane Harvey. (*Id.* at ¶ 7). In addition to damages sustained by Past Times's property, Davis also included in her claim (1) damages to property used by Rio

[1] Unless otherwise specified, docket citations in this Memorandum Opinion and Order refer to the docket in Civil Action No. 6:19-CV-65.

Grande Royalties, (*id.* at ¶ 9); (2) internet and phone services for Davis's other business, Upland Energy, (*id.* at ¶ 16); (3) restoration work on the Santa Rosa Building amounting to $145,987.49 performed by ServPro, a third-party contractor, (*id.* at 6); (Dkt. No. 24 at ¶ 24); and (4) $930 in legal expenses associated with the ServPro work, (Dkt. No. 1 at ¶ 18). Central has paid benefits only for those damages it deemed covered under the Policy—namely, the damages sustained by Past Times and $86,000 of ServPro's restoration work—but disputes liability for the remaining items. (*Id.* at ¶¶ 15–19). Central argues that "the Policy only provides insurance coverage pertaining to the retail gift shop business, Past Times," (*id.* at ¶ 11), and that other damages under the Premier Plus endorsement were covered up to $10,000. (Dkt. No. 17 at 14).

On July 19, 2019, Central filed this case, captioned Civil Action No. 6:19-CV-65, for declaratory judgment. Central asks the Court to declare that Central has fully discharged its obligations and has no further liability for the outstanding claims. (Dkt. No. 1 at ¶ 19). On August 23, 2019, Davis filed her own separate action in state court against Central and Frost Insurance Agency, Inc. ("Frost"), the agent that procured the Policy. That matter was removed to this Court as Civil Action No. 6:19-CV-86. In that case, Davis seeks a declaratory judgment on Central's liability with respect to the outstanding items and also alleges breach of contract, breach of duty of good faith and fair dealing, and violation of the Texas Insurance Code against Central. (6:19-CV-86, Dkt. No. 1 Ex. A at ¶¶ 15, 17, 22, 29). In the alternative, she alleges negligence and misrepresentation against Frost. (*Id.* at ¶ 32). Frost was later voluntarily dismissed from the case. That case was consolidated with Civil Action No. 6:19-CV-65 on August 4, 2021. (Dkt. No. 43).

Central and Davis filed competing Motions for Summary Judgment in this case.[2] (Dkt. No. 17); (Dkt. No. 22).  Both Parties have completed briefing on the Motions and have lodged objections to the summary judgment evidence.  (Dkt. No. 24); (Dkt. No. 32); (Dkt. No. 33); (Dkt. No. 34); (Dkt. No. 37); (Dkt. No. 40).  The Court now reviews the dueling Motions and related papers.

## II.   LEGAL STANDARD

Summary judgment is appropriate when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A material fact is one that might affect the outcome of the suit under governing law," and "a fact issue is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party."  *Renwick v. PNK Lake Charles, L.L.C.*, 901 F.3d 605, 611 (5th Cir. 2018) (quotations omitted).  The moving party "always bears the initial responsibility of informing the district court of the basis for its motion," and identifying

---

[2]     Also before the Court are cross motions for summary judgment originally filed in Civil Action No. 6:19-CV-86: Davis's Motion for Partial Summary Judgment on Breach of Contract Claim Against Defendant Central Mutual Insurance Company and Central's Cross Motion for Summary Judgment.  (6:19-CV-86, Dkt. No. 16); (6:19-CV-86, Dkt. No. 30).  There, the Parties move for summary judgment with respect to whether Central is liable, subject to an insurance Policy it issued to Davis, for the following insurance claims it has not paid: (1) property related to Davis's Rio Grande Royalties business; (2) internet and phone subscription services provided by Star2Star Communications; (3) restoration work charges by ServPro, a third-party contractor; and (4) legal expenses related to the restoration work.  (6:19-CV-86, Dkt. No. 16 at 16–17); (6:19-CV-86, Dkt. No. 30 at 20–25).  These motions are virtually identical to the Motions for Summary Judgment addressed in this Memorandum Opinion and Order.  As such, the Court **DENIES AS MOOT** the cross motions for summary judgment initially filed in Civil Action No. 6:19-CV-86.

In Civil Action No. 6:19-CV-86, Davis has additionally alleged breach of duty of good faith and fair dealing and a violation of the Texas Insurance Code against Central, however, she is not seeking summary judgment on those claims.  (6:19-CV-86, Dkt. No. 16 at 2).  Thus, the Court does not address those claims in this Memorandum Opinion and Order.

the record evidence "which it believes demonstrate[s] the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2253, 91 L.Ed.2d 265 (1986). "If the moving party fails to meet [its] initial burden, the motion [for summary judgment] must be denied, regardless of the nonmovant's response." *United States v. $92,203.00 in U.S. Currency*, 537 F.3d 504, 507 (5th Cir. 2008) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (per curiam)).

If the movant meets this burden, the nonmovant must then come forward with specific facts showing there is a genuine issue for trial. Fed. R. Civ. P. 56(c); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). The nonmovant must "go beyond the pleadings and by [the nonmovant's] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Nola Spice Designs, LLC v. Haydel Enters., Inc.*, 783 F.3d 527, 536 (5th Cir. 2015) (quoting *EEOC v. LHC Grp., Inc.*, 773 F.3d 688, 694 (5th Cir. 2014)). "The nonmovant must identify specific evidence in the record and articulate the precise manner in which that evidence supports his or her claim." *Carr v. Air Line Pilots Ass'n*, 866 F.3d 597, 601 (5th Cir. 2017) (cleaned up). "If the evidence is merely colorable, or is not significantly probative," summary judgment is appropriate. *Parrish v. Premier Directional Drilling, L.P.*, 917 F.3d 369, 378 (5th Cir. 2019).

The nonmovant's burden "will not be satisfied by 'some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence.'" *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005) (quoting *Little*, 37 F.3d at 1075). Hearsay evidence and unsworn documents that cannot

be presented in a form that would be admissible in evidence at trial do not qualify as competent opposing evidence. Fed. R. Civ. P. 56(c)(2); *Martin v. John W. Stone Oil Distrib., Inc.*, 819 F.2d 547, 549 (5th Cir. 1987). For evidence to be admitted, the materials "need only be *capable* of being 'presented in a form that would be admissible in evidence.'" *LSR Consulting, LLC v. Wells Fargo Bank, N.A.*, 835 F.3d 530, 534 (5th Cir. 2016) (quoting Fed. R. Civ. P. 56(c)(2)).

In reviewing a motion for summary judgment, the district court must view the evidence in the light most favorable to the nonmovant. *Coleman v. Hous. Indep. Sch. Dist.*, 113 F.3d 528, 533 (5th Cir. 1997). This means that factual controversies are to be resolved in the nonmovant's favor, "but only when . . . both parties have submitted evidence of contradictory facts." *Little*, 37 F.3d at 1075. The Court is not obligated to search the record on the nonmovant's behalf for evidence that may raise a fact issue. *Topalian v. Ehrman*, 954 F.2d 1125, 1137 n.30 (5th Cir. 1992).

In reaching a resolution on summary judgment, state law rules of contract interpretation are applied, with the court giving "effect to the intentions of the parties as expressed by the policy language," *Am. Nat'l Gen. Ins. Co. v. Ryan*, 274 F.3d 319, 323 (5th Cir. 2001), and interpreting the policy as a matter of law. A federal court sitting in diversity is bound to apply the law that would be utilized by the underlying state court. *See Jack H. Brown & Co., Inc. v. Toys "R" Us, Inc.*, 906 F.2d 169, 173 (5th Cir. 1990). Since

this case involves an insured who is a Texas citizen, Texas law controls in this action.[3] Tex. Ins. Code art. 21.42; *see Canutillo Indep. Sch. Dist. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 99 F.3d 695, 700 (5th Cir. 1996).

## III. DISCUSSION

### A. RELEVANT OBJECTIONS

As a preliminary matter, both Davis and Central have filed objections to certain evidence. Davis objects to parts of Sean Davis's affidavit, to the commercial insurance application attached as Exhibit B to his affidavit, and to some parts of Todd Brickman's affidavit.[4] (Dkt. No. 24 at 1–4). Central has responded to the objections. (Dkt. No. 33). For its part, Central objects to certain portions of Davis's affidavit, and to the invoice ServPro sent for its restoration work. (Dkt. No. 32 at 1, 4, 8, 10). Davis has likewise responded. (Dkt. No. 40).

Rule 56(c)(2) allows a party to "object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." The district court may strike affidavits or declarations that are not based on personal knowledge, set out facts that would not be admissible, or show that the affiant is not competent to testify

---

[3] Davis states that Texas law applies in this action. (Dkt. No. 19 at 1). Central's Motion and briefs, while not explicitly stating which state law governs, also operate under the assumption that Texas law applies. *See* (Dkt. No. 17 at 5–6, 9–10, 15–20); (Dkt. No. 34 at 5–6, 16–21).

[4] Sean Davis is a Commercial Lines Underwriting Supervisor working for Central, (Dkt. No. 18-1 at ¶ 1), and Todd Barickman is a Claims Supervisor also employed by Central, (Dkt. No. 18-2 at ¶ 1).

on the matters stated. Fed. R. Civ. P. 56(c)(4); *Akin v. Q–L Invs., Inc.*, 959 F.2d 521, 530–531 (5th Cir. 1992). With this in mind, the Court now turns to each of these objections.

**1. Central's Objections**

a. Mary Ann Davis Affidavit

Central objects to the following testimony from Mary Ann Davis. (Dkt. No. 32 at 4–8).

> Central has refused to pay anything more than $86,000 of the total ServPro invoice. My understanding is that Central claims ServPro cannot collect $145,987.49 from us because it agreed to limit its bill to $86,000, despite the fact that the additional $60,000 was for the additional work I specifically authorized and promised to pay ServPro to perform which no one knew needed to be done to save the Santa Rosa Building, and also because the adjuster working for Frost and Central told me to do whatever I needed to do to sa[v]e the building. Had this additional work not been done, Central would have had to pay a lot more than $60,000 because of the complete loss of the building.

(Dkt. No. 19-2 at ¶ 21). Central objects to Davis's statement reflecting the existence of an oral agreement between her and an insurance adjuster allowing her to incur additional expenses to restore the Santa Rosa Building. (Dkt. No. 32 at 4). Central argues this is barred by the parol evidence rule because it modifies a prior written agreement between Davis and ServPro. (*Id.* at 4–7). Davis disagrees, contending that the parol evidence rule does not apply since the testimony is not offered to alter the meaning of any contract, let alone her contract with ServPro. (Dkt. No. 40 at 3).

Under Texas law, "[w]hen parties 'have a valid, integrated written agreement,' the parol-evidence rule 'precludes enforcement of prior or contemporaneous agreements.'" *First Bank v. Brumitt*, 519 S.W.3d 95, 109 (Tex. 2017) (quoting *Hous. Expl. Co. v. Wellington*

*Underwriting Agencies, Ltd.*, 352 S.W.3d 462, 469 (Tex. 2011)). The rule does not apply to agreements made after the written agreement, nor does it prevent the written instrument from being later modified by the parties by oral agreement, notwithstanding a no-oral-modification clause in the contract or a legal requirement that a subsequent agreement must be made in writing. *South Hampton Co. v. Stinnes Corp*., 733 F.2d 1108, 1117 n.13 (5th Cir. 1984) (citing *Hyatt Cheek Builders v. Board of Regents*, 607 S.W.2d 258, 265 (Tex. Civ. App. – Texarkana, 1980, writ dism'd)). The Court agrees with Davis.

First, the alleged oral agreement between Central and Davis is not a prior or contemporaneous agreement barred by the parol evidence rule. In essence, Central challenges an oral agreement made *after* Davis and ServPro's original contract, to which Central was not a party. Therefore, Central cannot use the parol evidence rule to avoid its obligations under a different contract between it and Davis. Second, the agreement itself does not alter the ServPro work contract since Davis and Central's alleged oral agreement does not modify the contract between Davis and ServPro. In other words, Davis and Central agreeing that Davis could do whatever was needed to be done to restore the Santa Rosa Building does not, in effect, change or modify Davis's prior written contract with ServPro. Central's objection is overruled.

b. ServPro Invoice

Central also objects to an invoice from ServPro containing the total amount ServPro is charging Davis: $145,987.49. (Dkt. No. 32 at 10). Central argues that this "estimate" is hearsay since it is being offered as proof of what is owed to ServPro. (*Id.*).

Davis responds that "Central has waived its objection" since it admitted ServPro is asking for this amount.  (Dkt. No. 40 at 6).

Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."  *United States v. Polidore*, 690 F.3d 705, 719 (5th Cir. 2012) (citing Fed. R. Evid. 801(c)).  Unless covered by an exception, hearsay evidence is inadmissible at trial.  Fed. R. Evid. 802.  With respect to invoices, some courts have held that the total amount due may not be considered to prove that something is valued as much as the invoice proffers, unless the invoice is admitted through the business records exception of Rule 803(6).  *In re 3RC Mech. & Contracting Servs., LLC*, 502 B.R. 548, 552 (Bankr. N.D. Ill. 2013) (Without a foundation to admit invoices through Rule 803(6), the invoices may still be used "for their effect on the witness," that the party indeed charged a certain amount on each invoice against another party's contract, but "may not, however, be used to show the truth of statements in the invoices: that some particular subcontractor submitting an invoice had done such and such work, reasonably worth such and such amount of money."); *ASI Lloyds v. Lytell*, 781 F. Supp. 2d 326, 329 n.1 (E.D. La. 2011) (concluding that an invoice showing that a plumber found freeze damaged piping in defendant's flooded house was inadmissible because the defendant cited it to prove the truth of the matter asserted—that the plumbing was indeed damaged—without attaching an affidavit from the plumber); *see also In re Soyong Suh*, 2018 WL 2113092, at *15 (Bankr. D.N.J. May 4, 2018) (finding that an invoice of legal fees may not serve as evidence to prove that additional expenses were

necessary, or the amount charged reasonable, since the invoice did not qualify under the business records exception).

Insofar as Davis offers the invoice showing a total of $145,987.49 of expenses to show that the *value* of the repairs was that amount, (Dkt. No. 19 at ¶¶ 22, 24), it is hearsay for which Davis offers no exception. But the invoice is not subject to the rule against hearsay evidence to the extent Davis uses it to show how much ServPro is charging her for the repairs. *See In re 3RC Mech.*, 502 B.R. at 552; *Harris v. Jamaica Auto Repair Inc.*, No. 03-CV-417 (ERK), 2009 WL 2242355, at *1 (E.D.N.Y. July 27, 2009) (concluding that the hearsay rule was not violated "where invoices are admitted not for their truth but simply for the fact that they state particular amounts and thereby substantiate an individual's testimony as to how much was paid for a specific service or item" (internal quotations omitted)). Further, the Court agrees that Central has waived its objection with respect to Davis using the invoice for such purposes since Central itself has stated that ServPro is charging an amount of $146,000. (Dkt. No. 17 at 13).

**2. Davis's Objections**

a. Sean Davis Affidavit

Davis objects to testimony from Sean Davis (the "Underwriting Supervisor") introducing the insurance application Davis initially submitted because the Underwriting Supervisor "lacks personal knowledge to testify as to what business Davis was requesting to be insured . . . ." (Dkt. No. 24 at 1–2).

> Attached as Exhibit "B" to this affidavit is a true and correct copy of the application for insurance that was submitted to Central for insurance for Mary Ann Davis DBA Past Times.

> The only business that was being requested to be insured by Central in that application was described in the application as a "retail nick nak store". Such a business would fall under the underwriting classification code of 13506, a gift shop. The type of business requested to be insured is important, because it determines the possible risks involved in insuring same, which would determine whether Central would even insure the business in the first place and if so, the premium Central would charge for the issuance of an insurance policy.

(Dkt. No. 18-1 at ¶ 2). Central responds that the Underwriting Supervisor is "merely testifying to the insurance Central was requested to write based on the insurance application submitted to Central," and the affidavit "establishes [the Underwriting Supervisor's] personal knowledge of the application . . . ." (Dkt. No. 33 at 8).

Rule 602 of the Federal Rules of Evidence provides, "[a] witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter," and "[e]vidence to prove personal knowledge may consist of the witness's own testimony." Fed. R. Evid. 602.

As Central notes, the Underwriting Supervisor is merely testifying to show that "[t]he only business that was being requested to be insured by Central *in that application* was described in the application as a 'retail nick nak store'." (Dkt. No. 18-1 at ¶ 2) (emphasis added). The statement is not being offered for the purpose of establishing what Davis intended the Policy to cover—only that the insurance application submitted to Central described the business as a gift shop. Moreover, the Underwriting Supervisor also testifies to his personal knowledge "gained in [his] capacity as Commercial Lines Underwriting Supervisor," and his familiarity "with policies issued by" Central, "including those issued over the years to Mary Ann Davis DBA Past Times." (*Id*. at ¶ 1).

In other words, the Underwriting Supervisor *does* have personal knowledge of the object of his testimony: Davis's application for insurance coverage. Thus, the objection is overruled.

b. Commercial Insurance Application

Davis also objects to the proffered insurance application as well as the testimony offering it because it allegedly violates the parol evidence rule. (Dkt. No. 24 at 2). Davis argues that the application is extrinsic evidence and is dated 10 years prior to the claim arising under the Policy at issue. (*Id.*). Central responds that the insurance application is offered to provide context on "(a) the insurance application which Central received, and (b) how Central issued a policy based on that application," (Dkt. No. 33 at 4). Central asserts that the parol evidence rule "does not prohibit evidence of negotiations that led to a contract[,]" and that "a court is to examine all parts of the contract, and the circumstances surrounding the formation of the contract." (*Id.* at 2–3). Central, more importantly, argues that the Policy incorporates the representations made in the insurance application through the Representations section of the Policy. (*Id.* at 4) (citing Dkt. No. 18-3 at 60–61).

When an integrated contract exists, "the parol evidence rule precludes enforcement of any prior or contemporaneous agreement that addresses the same subject matter and is inconsistent with the written contract." *West v. Quintanilla*, 573 S.W.3d 237, 243 (Tex. 2019). The "mere application for insurance" is not a contract. *Minn. Mut. Life Ins. Co. v. Newman*, 157 S.W.2d 667, 671 (Tex. Civ. App. – Fort Worth 1941, writ ref'd). In this case, the Policy's Representations section incorporates *any* representations Davis

made to Central when the Policy is accepted. *See* (Dkt. No. 18-3 at 60–61). This would include the representations she made in the application. The parol evidence rule is therefore of no help to Davis with regard to a representation she made to Central in her application for the Policy.[5] As such, the objection is overruled.

Davis further objects to the insurance application because it has not been authenticated. (Dkt. No. 24 at 2). Central does not respond to the objection. Rule 901 of the Federal Rules of Evidence states, "[t]o satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Fed. R. Evid. 901(a). One such evidence is testimony that an item is what it is claimed to be. Fed. R. Evid. 901(b)(1). Here, the Underwriting Supervisor has testified to the nature of the insurance application, what it contains, and how it relates to the Policy. (Dkt. No. 18-1 at ¶ 2). The objection is, therefore, overruled.

Finally, Davis argues that the insurance application is hearsay. (Dkt. No. 24 at 2). Central alleges that it is not hearsay because it is Davis's admission through Frost, the authorized representative and agent she instructed to procure insurance. (Dkt. No. 33 at 9–10). A statement is not hearsay if it is offered against a party-opponent and was made

---

[5] Indeed, many courts have considered insurance applications to examine the representations of the parties when entering into an insurance contract. *See Mut. Life Ins. Co. v. Ford*, 103 Tex. 522, 524, 131 S.W. 406, 407 (Tex. 1910); *QBE Ins. Corp. v. McFarland*, No. 3:10CV338-DPJ-FKB, 2011 WL 3625308, at *3 (S.D. Miss. Aug. 17, 2011); *Westfield Ins. Co. v. Vandenberg*, 796 F.3d 773, 778–80 (7th Cir. 2015); *Ohio Sec. Ins. Co. v. Truck Tire Sales, Inc.*, 425 F. Supp. 3d 982, 998–99 (N.D. Ill. 2019); *Smith v. Burlington Ins. Co.*, No. 17-CV-58-JHP-FHM, 2018 WL 1569498, at *4–5 (N.D. Okla. Mar. 30, 2018).

by someone with the opponent's authorization or by the opponent's agent on a matter within the scope of their relationship.  Fed. R. Evid. 801(d)(2)(C)–(D).  In the Underwriting Supervisor's affidavit, the application is used to show what Central relied on as a basis for constructing the Policy and its terms.  (Dkt. No. 18-1 at ¶¶ 2–4).  It is not offered to prove what Davis's intentions were when she communicated with Frost.  Thus, the application is not hearsay for those purposes.  And insofar as the insurance application is used to illustrate Davis's representations when she applied for the Policy, the Court agrees with Central that it is also not hearsay.  In her own affidavit, Davis alleges that she consulted with Frost agent Jacob to obtain insurance coverage for the Santa Rosa Building, which Jacob accomplished on September 25, 2001.  (Dkt. No. 19-2 at ¶¶ 8–11).  The insurance application states that Frost was the agency preparing the application and "Past Times Mary Ann Davis DBA" was the applicant.  (Dkt. No. 18-1 at 5).  Given this, it is clear that Davis authorized Jacob to apply for and procure insurance, and the application in question was a product of that authorization.  For all these reasons, the objection is overruled.

c.    Todd Barickman Affidavit

Davis finally objects to the following testimony from Todd Barickman, Central's Claims Supervisor, arguing that the testimony introducing the Policy is barred by the parol evidence rule.  (Dkt. No. 24 at 3).

> The insurance claim of Past Times that is involved in this lawsuit is for damage claimed by Past Times to have occurred on or about August 26, 2017 to the building located at 105 Santa Rosa, Victoria, Texas 77901, and property contained therein, from Hurricane Harvey. At the time of such damage

> claimed by Past Times, Central had a policy of insurance in effect, Policy No. CLP 836945020, which Central had issued to Mary Ann Davis DBA Past Times. A true and correct copy of that policy is attached as Exhibit "F" to this affidavit and expressly made a part hereof. As that policy shows, the named insured on that policy is Mary Ann Davis DBA Past Times.

(Dkt. No. 18-2 at ¶ 2). But the parol evidence rule is not relevant here since the testimony merely gives background to the dispute and introduces to the record the actual Policy at issue. The Court, therefore, overrules the objection—along with any remaining objections to the offered evidence not considered in the Court's analysis—and moves on to the merits of the Motions.[6]

---

[6] Central and Davis object to numerous statements from the affidavits offered by both Parties. Central contends that (1) Davis's statement that she believed Frost knew that the Santa Rosa Building was home to both Past Times and Rio Grande Royalties is inadmissible speculation, (Dkt. No. 32 at 1–2); (2) Davis's statement alleging that she is unaware of the reason as to why Star2Star Communications addressed a phone and internet subscription agreement to "Mary Ann Davis-Upland Energy" is barred by the parol evidence rule, (*Id.* at 4–5); (3) and Davis's statement that the "[t]he mailing address for Rio Grande Royalties has always been P.O. Box 2955, Victoria, Texas" and "[t]he mailing address for Past Times has always been P.O. Box 1708, Victoria, Texas" is barred by the sham affidavit rule, (*Id.* at 8). In its review, the Court did not consider any of the offered statements from Davis to determine what the Policy covers and the extent of coverage offered. The Court solely needed to review the Policy and consider the insurance application—which, as discussed, the Policy incorporates as Davis's representations—to answer both questions.

For Davis's part, she argues that (1) the Underwriting Supervisor's testimony as to what underwriting classification code 13506 means is inadmissible testimony since Central has not established the Underwriting Supervisor's competence on the matter, (Dkt. No. 24 at 1); (2) that such testimony regarding the classification codes are, nevertheless, barred by the best evidence rule since the codes are "necessarily derived from a writing that has not been provided," (*Id.*); (3) the initial insurance policy issued for the 2006–07 term is inadmissible due to the parol evidence rule, (*Id.* at 2); (4) the sample declaration pages offered by Central to show their practices with respect to describing the named insured in other polices are likewise barred by the parol evidence rule, (*Id.* at 3); (5) and the Claims Supervisor's testimony that (a) the named insured on the Policy is "Mary Ann Davis DBA Past Times," and that (b) Central is not liable for the ServPro restoration work, the phone subscription, Rio Grande Royalties' property and any legal services, should be disregarded as impermissible legal conclusions, (*Id.* at 3–4). In its review, the Court (continue)

### B.    THE SUMMARY JUDGMENT MOTIONS

In its Motion, Central argues that the Policy is unambiguous as to what is covered: (1) the Past Times Business and its property, and (2) unrelated property capped at $10,000.   (Dkt. No. 17 at 1, 4, 14).   Davis, however, contends that the Policy unambiguously covers all her property in the Santa Rosa Building.  (Dkt. No. 24 at 19). But contrary to Central's assertions, she argues that the property not associated with Past Times is also fully covered by the Policy because a sole proprietorship is not separate and distinct from the sole proprietor.  (Dkt. No. 24 at 12–13).

An insurance coverage dispute like this one—where the relevant policy is not ambiguous—is amenable to resolution in a summary judgment context because it is a question of law for the court.  *ACE Am. Ins. Co. v. Freeport Welding & Fabricating, Inc.*, 699 F.3d 832, 842 (5th Cir. 2012) (quoting *Gonzalez v. Denning*, 394 F.3d 388, 392 (5th Cir. 2004)). Texas courts construe insurance policies in accordance with the same rules of construction applied to written contracts.  *Don's Bldg. Supply, Inc. v. OneBeacon Ins. Co.*, 267 S.W.3d 20, 23 (Tex. 2008); *Trinity Universal Ins. Co. v. Cowan*, 945 S.W.2d 819, 823 (Tex. 1997).  The Court's primary concern is to ascertain the parties' intent as expressed in the policy's language.  *Kelley-Coppedge, Inc. v. Highlands Ins. Co.*, 980 S.W.2d 462, 464 (Tex. 1998).

---

did not consider what underwriting classification 13506 meant, nor did it consider the 2006–07 policy or the sample declaration pages.  As stated above, the Court's review was solely with respect to the Policy and the insurance application.  The Court also did not consider the Claim's Supervisor's statements with respect to the identity of the named insured and the objects of insurance coverage, since those questions were, again, sufficiently answered by a review of the Policy, supplemented by a review of the insurance application.

If a policy's provisions are not ambiguous, the policy will be construed as written, with undefined and operative terms being given their ordinary and usual meaning. *Don's Bldg. Supply, Inc.*, 267 S.W.3d at 23. Only when an insurance contract is susceptible to more than one reasonable interpretation may the court resort to the rule requiring adoption of the interpretation most favorable to the insured. *Id.* However, an ambiguity does not arise merely because the parties advance conflicting contract interpretations. *Kelley-Coppedge, Inc.*, 980 S.W.2d at 465. The fact that the parties disagree as to whether there is coverage or the extent of that coverage does not create an ambiguity. *Indem. Ins. Co. of N. Am. v. W & T Offshore, Inc.*, 756 F.3d 347, 352 (5th Cir. 2014) (quoting *Traveler Lloyds v. Pac. Emps. Ins. Co.*, 602 F.3d 677, 681 (5th Cir. 2010)). Nor may extrinsic evidence be admitted for the purpose of creating an ambiguity. *Nat'l Union Fire Ins. Co. of Pittsburgh v. CBI Indus., Inc.*, 907 S.W.2d 517, 521 n.5 (Tex. 1995). "When construing the policy's language, [the court] must give effect to all contractual provisions so that none will be rendered meaningless." *Am. Mfrs. Mut. Ins. Co. v. Schaefer*, 124 S.W.3d 154, 157 (Tex. 2003).

Since both Parties contend that the Policy is unambiguous, the Court must determine which of the Parties' interpretations of the Policy language is correct with respect to what the Policy covers and the extent of that coverage.

### 1. <u>What is Covered and To What Extent Coverage is Provided</u>

Central and Davis dispute whether the Policy language provides full coverage only to Past Times, with unrelated property covered up to $10,000, or if the Policy fully covers *all* property in the Santa Rosa Building, including the property owned by Rio

Grande Royalties.  Central argues that the Policy clearly states that only property related to Past Times is fully covered, (Dkt. No. 17 at 4, 14), and refers to various parts of the Policy to support its position: (a) "Mary Ann Davis DBA Past Times" is stated as the named insured in the "Retail Policy Common Declarations," which also describes the business being insured as a "gift shop"; (b) the "Building Coverage and Personal Property of Insured" section describes the named insured's "Occupancy" as a "GIFT SHOP"; (c) the "Commercial General Liability Coverage Part Declarations" describes the insured as a "GIFT SHOP"; and (d) the Classification Descriptions for "Premises and Operations" and "Products and Complete Operations" are designated as "GIFT SHOPS – OTHER THAN NOT-FOR-PROFIT." (Dkt. No. 17 at 10).  Central further notes that the "Building and Personal Property Coverage Form" in the policy states that "the words 'you' and 'yours' refer to the Named Insured shown in the Declarations," which would be "Mary Ann Davis DBA Past Times." (*Id.* at 10–11).  Central also explains that the "Your Business Personal Property" section describing the Policy's property coverage "includes furniture, fixtures, machinery, equipment and 'all other personal property owned by you and used in your business[,]'" with the term "business" used in its singular form and not plural. (*Id.* at 11).

Conversely, Davis argues that because a sole proprietorship does not have a separate legal identity apart from the sole proprietor, the Policy unambiguously covers all of her business and personal property, which would effectively include property used by Rio Grande Royalties, her oil and gas landman business.  (Dkt. No. 24 at 19).  She

contends that the "dba" designation did not limit the scope of coverage to Past Times. (Dkt. No. 19 at 9).

"Under Texas Law, a sole proprietorship has no separate legal existence apart from the sole proprietor." *CU Lloyd's v. Hatfield*, 126 S.W.3d 679, 684 (Tex. App.—Houston [14th Dist.] 2004, pet. denied). "[F]or insurance-coverage purposes, a sole proprietorship is not a legal entity separate and distinct from the individual owner doing business in that name." *Id.* (collecting cases). As such, Davis and Past Times are one and the same and, following *Hatfield*, the Policy would cover Davis individually and in her capacity as Past Times's sole proprietor. *Hatfield*'s rule, however, also establishes that Davis and her other sole proprietorship, Rio Grande Royalties, are one and the same as well. The critical issue, therefore, is whether the Policy limited full coverage to Davis's property related to Past Times or if it extended full coverage to every property that Davis owns, such as those used for Rio Grande Royalties' operations.

Both Parties focus on the effect of the "dba" designation—"Mary Ann Davis DBA Past Times"—found in the Declarations, and whether that designation limits coverage to Past Times. (Dkt. No. 17 at 10); (Dkt. No. 19 at 9). Texas state courts have not ruled on the limiting effect of "dba designations" where (1) a sole proprietor manages other sole proprietorships in addition to the "dba" designated entity; and (2) argues that her insurance covers those other sole proprietorships despite the fact that they were not named or designated. Given this, both Central and Davis have cited to opinions from federal and non-Texas state courts to bolster their case. (Dkt. No. 17 at 6–9); (Dkt. No. 19 at 8–12).

In the context of insurance policies, there are two seemingly conflicting strains of case law on how a "dba" designation affects coverage with respect to the other businesses a sole proprietor owns but did not name in the policy.  Not surprisingly, the Parties differ on which approach should control here.  As Central contends, some courts, including one in the Western District of Texas, have held that the designation serves to limit a policy's insurance coverage only to the business activities and properties related to the "dba" designation.  *See Lincoln Gen. Ins. Co. v. Pacheco*, No. EP-11-CV-482-DB, 2012 WL 12539325, at *5 (W.D. Tex. Mar. 2, 2012) (holding that insurance coverage does not apply to an insured's other sole proprietorships because such an argument was "untenable"); *see also Consol. Am. Ins. Co. v. Landry*, 525 So. 2d 567, 568–69 (La. Ct. App. 1988) (holding that the "dba" designation in the policy limited coverage to only the sole proprietorship named as the insured because of the unambiguous definition of "insured" in the relevant policy); *Charter Oak Fire Ins. Co. v. Coleman*, 273 F. Supp. 2d 903, 913 (W.D. Ky. 2003) (citing *Landry*, holding that "dba" designation was a limiting phrase, and noting that "had the parties intended otherwise," the policy would not have included such a phrase in order to cover all of the insured's business activities).

For instance, in *Landry*, an insurance company, Consolidated American, filed suit against another insurance provider, State Farm.  Consolidated American sought an award for the damages State Farm's alleged insured, Lersey Landry dba Landry's Lumber Yard, allegedly caused Consolidated American's insured, Roland LeMaire, due to Landry's negligence in installing electrical wiring and circuiting in LeMaire's home. *Landry*, 525 So. 2d at 567–68.  In the trial court, State Farm filed a motion for summary

judgment arguing that the policy did not cover Lumber Yard; rather, it solely covered a different business entity Landry operated—Landry's Apartments. *Id.* at 568. State Farm reasoned that it was not liable for Lumber Yard because the named insured in the policy was "Lersey Landry d/b/a Landry's Apartments." *Id.* Both Landry's Apartments and Lumber Yard were sole proprietorships. *Id.*

In affirming summary judgment for State Farm, the appellate court noted that the insurance policy specifically defined the "insured" as "the person so designated [in the declarations, if such named insured is designated as an individual,] *but only with respect to the conduct of a business of which they are the sole proprietor* . . . ." *Id.* (emphasis added). Given this definition, the appellate court agreed with the trial court's holding that the "dba" designation served as a "limiting phrase," given the "context of the policy" in which the defined term "insured" appeared. *Id.* Since the definition limited coverage to activities related to an individual's sole proprietorship, and only one sole proprietorship—Landry's Apartments—was named as the insured, the appellate court found that the policy was not ambiguous and clearly provided coverage to Landry only with respect to his operations of Landry's Apartments. *Id.* at. 568–69.

Other courts—and Davis—have disagreed with this holding, noting that a "dba" designation does not limit coverage automatically, absent explicit Policy language limiting coverage. *See Carlson v. Doekson Gross, Inc.*, 372 N.W.2d 902, 905–06 (N.D. 1985) (concluding a "dba" designation does not exclude or limit coverage absent specific exclusion limiting coverage); *Providence Washington Ins. Co. v. Valley Forge Ins. Co.*, 50 Cal. Rptr. 2d 192, 196 (Cal. Ct. App. 1996) ("*Landry*'s error lies in construing the "dba"

designation as a "limiting phrase". . . . We agree with the *Carlson* court that such a limitation cannot be fairly read in the designation of an individual as a "dba," although coverage limited to certain business operations could be the subject of specific exclusions or endorsements.").

In *Carlson*, the North Dakota Supreme Court held that an insurer who wishes to limit liability could do so "by specific exclusions or endorsements to the policy, not by a limiting designation of the named insured." 372 N.W.2d at 906. In that case, an employee filed an action against Edwin Carlson, the insured, for an injury that he sustained while working on Carlson's farm, Harrington Ranch, a sole proprietorship. *Id.* at 904, 907. At the time of the incident, Carlson had two insurance policies issued by American Insurance with the named insured "Edwin O. Carlson dba Aero Block & Cement Company and Carlson Trucking." *Id.* at 904. Both designated entities were also sole proprietorships. *Id.* at 906. American denied coverage, and in the subsequent litigation, the trial court decided in American's favor, holding that Harrington Ranch was a separate business entity not covered by the policies. *Id.* at 904, 906–7. But on appeal, the North Dakota Supreme Court reversed that holding. *Id.* The court reasoned that because all of Carlson's sole proprietorships were not separate legal entities, Harrington Ranch—a sole proprietorship acquired after the policy was issued—need not be listed as a named insured to be covered unless specific exclusions or endorsements in the policy established otherwise. *See id.* at 906–07. In short, *Carlson* holds that a "dba" designation is not a limiting phrase that automatically limits coverage to the named sole proprietorships. *Id.*

Despite the apparent contradictions, this Court finds that *Carlson*'s outcome differed from *Landry*'s holding, not because of how the cases view "dba" designations generally, but because of how the circumstances surrounding the policies at issue assisted both courts in deciding whether the "dba" designation acted as a limiting phrase. Unlike in *Landry*, where the policy's definition of "named insured" was limited to the individual named in the declarations and his activities in *a* sole proprietorship, the term "named insured" in the *Carlson* policy was defined as: "(1) the named insured stated in the declarations; [or] (2) *any* wholly owned subsidiary of the named insured *now existing or hereafter acquired* . . . ."[7] *Id.* at 907 (emphasis added). The *Carlson* definition of the "named insured" did not provide language that made the "dba" designation a limiting phrase.

Thus, although sole proprietorships are not separate legal identities from the sole proprietor, the "dba" designation may still serve as a limiting phrase *if* the policy language shows that the parties intended to limit insurance coverage to one specific sole proprietorship. Considering the effect of "dba" designations using the insurance policy's language and provisions is consistent with Texas rules of contract interpretation, which provides that a court must "give effect to *all* contractual provisions *so that none will be rendered meaningless*." *Schaefer*, 124 S.W.3d at 157 (emphasis added); *see Batts v. Tow-Motor*

---

[7] The *Carlson* definition further notes that the named insured may be "any other organization the control and management of which is now held or hereafter acquired by the named insured," provided that such organization will be covered "only for the first 30 days following date of such acquisition unless the named insured reports such acquisition to the Company and appropriate endorsement is issued to form a part hereof." 372 N.W.2d at 907. The court determined that because Harrington Ranch was a sole proprietorship, it would not be classified as a separate entity or "organization" insofar as Carlson is required to report its acquisition for it to be covered by the policy. *Id.*

*Forklift Co.*, 66 F.3d 743, 749 (5th Cir. 1995) ("In deciding an unsettled point of . . . state law, *Erie* requires that we determine how the [state's] Supreme Court would interpret its own law if presented with the question." (cleaned up)).  Merely disregarding the "dba" designation as language without effect would not be true to Texas law, while automatically attaching a limiting effect without considering the policy language would also be improper.

This synthesis of the seemingly contradictory views on "dba" designations is helpfully illustrated in *Pacheco* from the Western District of Texas.  In that case, the court held, as in *Carlson*, that the "named insured" was the policyholder himself in his individual capacity and Mexico Lindo—his sole proprietorship named in the policy.  2012 WL 12539325, at *5.  But, citing to *Landry*, the court did not find that such coverage extended to the policyholder's other sole proprietorship, Los Paisanos, which was a sole proprietorship that the policy did not name.  *Id.* ("Chavira [the sole proprietor] and Mexico Lindo [the "dba" commercial operation] are legally one and the same entity . . . . Consequently, coverage . . . extends to both Mexico Lindo, the sole proprietorship, and Chavira individually, the sole proprietor.  To the extent that Defendants argue such coverage should extend to Chavira's other sole proprietorship, Los Paisanos, the Court finds this argument untenable.").

Such a synthesis of *Carlson* and *Landry* is shown in more detail in *Charter Oak Fire Ins. Co. v. Coleman*, 273 F. Supp. 2d 903 (W.D. Ky. 2003).  In *Coleman*, an insurance company, Essex Insurance, provided general commercial liability coverage to "Russ Coleman d/b/a Johnny's Bad Ass Motorcycles."  *Id.* at 905.  During the policy's term, one

of Coleman's employees caused a fire in the building where Coleman operated Johnny

BAM and another business, Advanced Auto Electric.  *Id.*  The insurance companies

covering Edwin Parrot, the building owner, and L/A Auto Cleaning, another tenant, filed

suit against Coleman for damages related to the fire.  *Id.* at 906.  Essex filed a declaratory

judgment action seeking to disclaim liability for any damages assessed against Coleman.

*Id.*  Among other things, the court determined that the Essex policy excluded liability

coverage for property damage to any portions of the building owned, rented, or occupied

by the named insured.  *Id.* at 912.  Thus, "[e]ven though Coleman may be liable for all the

damages [the owner and other tenant] suffered, under the CGL policy Essex Insurance

will be liable only for the damages to portions of the building which Coleman does not

occupy."  *Id.* at 912.

Since Coleman had two sole proprietorships operating out of the building, the

court needed to determine if the policy, and more importantly, the exclusion, applied to

both.  *Id.* at 913.  If it did, the liability exclusion would apply to the portions of the building

owned, rented, or occupied by Johnny BAM *and* Advanced Auto Electric.  *Id.*  This would

mean that Parrot, as the building's owner, could not recover the damages the fire inflicted

on the spaces Coleman used for *both* his sole proprietorships.  Fortune—and more

significantly, the law—favored Parrot, as the court found that the policy only governed

Johnny BAM.  *Id.*  As in *Carlson*, the court stated that "[a] sole proprietorship is generally

not considered a distinct legal entity" from the sole proprietor.  *Id.*  Despite this, the court

still determined, citing *Landry*, that "[t]he insurance policy *clearly indicates* that coverage

applies to the motorcycle repair business."  *Id.* (emphasis added).  The court noted that

"[h]ad the parties intended otherwise, the Policy would not have included the limiting phrase 'dba Johnny Bad Ass Motorcycles' in the designation of the insured." *Id.* Thus, Parrot could recover from Essex Insurance damages the fire inflicted on all of the building's parts, excluding only the portions Johnny BAM occupied. *Id.* at 913–14.

In another example, in *McFarland*, the court held that insurance coverage was limited to the sole proprietorship named in the policy, McFarland Janitorial, and that coverage did not extend to McFarland's other sole proprietorship, Green Hill. *QBE Ins. Corp. v. McFarland*, 2011 WL 3625308 (S.D. Miss. Aug. 17, 2011). The court—while noting McFarland's failure to respond which served to "waiv[e] any argument that coverage exists for Green Hill"—recognized that "undisputed facts" served as the basis for the insurer's argument that the coverage it provided was limited to McFarland Janitorial. *Id.* at *3. These facts were that (1) McFarland Janitorial, and not McFarland himself or Green Hill, was designated as the named insured in the declarations; (2) McFarland Janitorial was designated as the named insured in the insurance application; (3) the "Business Description" subsection along with the "Classification and Premium" section of the declarations described the insured's business as "Janitorial Services"; and (4) "Green Hill" or "hazardous tree removal" (the business operation Green Hill was contracted to do) was never mentioned in the policy. *Id.* The Court further acknowledged the insurer's contention that "several courts have found no coverage under analogous circumstances." *Id.* (collecting cases).

In this case, the Policy language is clear that Central was insuring a "gift shop" located in the Santa Rosa Building. *See* (Dkt. No. 18-2 at 6). The Declarations state the

named insured as "Mary Ann Davis DBA Past Times." (*Id.*). Directly below that identification, the "Business Description" is stated as "Gift Shop" and the form of business as "Individual." (*Id.*). The Policy shows premiums calculated and charged for "GIFT SHOPS – OTHER THAN NOT-FOR-PROFIT." (*Id.* at 12). The Policy also provides that "[t]he first Named Insured *shown in the Declarations* or Change Endorsement: [] Is responsible for the payment of all premiums; and [] Will be the payee for any return premiums we pay." (*Id.* at 14) (emphasis added). On one page where the named insured is stated as "Mary Ann Davis," the "Occupancy" for the named insured is described as a "gift shop," and nothing else. (*Id.* at 9). On another page, the "Premises and Operations" and "Products and Completed Operations" of the insured are classified as "GIFT SHOPS – OTHER THAN NOT-FOR-PROFIT." (*Id.* at 12). The Building and Personal Property Coverage Form additionally states that the terms "you" and "yours" refer to the named insured in the Declarations ("Your Business Personal Property consists of . . . [a]ll other personal property *owned by you and used in your business*"). (*Id.* at 39) (emphasis added). And as Central persuasively contends, the construction of the sentence defining "Your Business Personal Property" clearly shows singular usage for the term "your business." No other entity except for "Mary Ann Davis" and "Past Times" was named in the Policy. No other designation except for "gift shop" was used to describe the insured anywhere in the papers.[8]

8 Davis argues that since the Policy also insured against lost business income, and that Past Times "was the only business out of the Santa Rosa Building that generated income[,]" "[i]t is reasonable to assume . . . that Central's 'gift shop' designation reflects this component of (continue)

The Policy also deleted "Coverage Extension for Personal Effects and Property of Others," replacing such coverage with an extension of "the insurance applie[d] to Your Business Personal Property" to "Personal effects owned by you, your officers, your partners or members, your managers or your 'employees.'" (*Id.* at 111). This coverage extension came with a $10,000 maximum payout for loss or damage, but not "more than $5,000 for loss or damage to the property of any one person under this Extension." (*Id.*). This shows, as Central contends, that the Policy surely contemplates coverage for other property unrelated to "*your business*" which would be, for all intents and purposes, Past Times. Essentially, the provision differentiates between personal effects "owned by you," and the property of "your business" to which coverage fully applies. Aside from this general reference to personal effects, no other entity, business, or property except for the terms "Mary Ann Davis" and "Past Times" were used or named in the Policy.

The insurance application that was the basis for the Policy is similarly clear. The application shows that Mary Ann Davis, through Frost, applied for insurance coverage for Past Times, given that the "Application Information" shows "Past Times Mary Ann Davis DBA" as the "First Named Insured & Other Named Insureds." *See* (Dkt. No. 18-1 at 5). Later in the application, the "Applicant (First Named Insured)" is designated as "Past Times." (Dkt. No. 18-1 at 7). The description of the insured is also consistent with,

---

coverage and does not purport to limit the scope of coverage to certain personal property." (Dkt. No. 19 at 12). This interpretation is unfounded given the Policy. Davis does not cite to, and the Court did not find, a Policy provision establishing that the "gift shop" designation was *only* with respect to lost business income coverage. On the contrary, it is clear that full insurance coverage—as the Policy contemplates and provides—is extended to the named insured, Mary Ann Davis, and her gift shop, Past Times.

and identical to, the Policy, with the insured's operations described as a "Retail nick nak store," (*Id.* at 5), and "Gift Shop," (*Id.* at 8).  As in the Policy, no other sole proprietorship such as Rio Grande Royalties was named in the application.  Neither was a reference to an oil and gas landman business nor any other type of sole proprietorship included.  Other than Davis, the only other entity referenced was Past Times.

Common sense dictates that there is a substantial difference between the business activities and risks associated with a gift shop and an oil and gas landman business.  Given the Policy language—and the fact that the insurance application illustrates Davis's representations to Central virtually mirroring the Policy's language—Davis's assertion that all her property is covered without being subject to the $10,000 limit is unpersuasive.  Such a holding would effectively mean that an individual with multiple sole proprietorships could apply for insurance as an individual "doing business as" one of her trade names, designate her operations and risks in a way that solely implicates that one entity, and pay for premiums calculated for that single enterprise, but still effectively gain full coverage for all her other business pursuits.  To agree with Davis's interpretation when nothing else aside from a gift shop was described in the Policy would, indeed, be "untenable."  *Pacheco*, 2012 WL 12539325, at *5; *see also Gemini Ins. Co. v. S & J Diving, Inc.*, 464 F. Supp. 2d 641, 649–50 (S.D. Tex. 2006) (finding that an insurance policy covered activities solely related to what was described in the policy, as it would be unreasonable to conclude that the policy covered "any and all activity not specifically excluded, when the insured negotiated as, and described itself to be," such an operation); *Westfield Ins. Co. v. Vandenberg*, 796 F.3d 773, 780 (7th Cir. 2015) ("[W]e would not expect [insurance]

policies to address risks not inherent in that business. To hold otherwise would require the parties to conjure up and exclude explicitly any and all activities in which [that business] might engage. Such a speculative exercise in hypotheticals would be nonsensical.").

The Policy language is clear. It contains no ambiguity as to what is covered: Mary Ann Davis individually in her role as sole proprietor of Past Times, the gift shop named and described. There is also no ambiguity as to the extent of coverage: the full value of the property related to the gift shop along with a $10,000 maximum limit for individually owned property. Davis does not point to any Policy provision or language—aside from stating that she is one and the same legal entity as to all her sole proprietorships—that shows otherwise. The Court now turns to each of Davis's outstanding claims to determine if they are covered by the Policy.

**2. <u>Davis's Insurance Claims</u>**

In its Complaint, Central states that Davis filed an insurance claim for the following: "(1) $44,515 worth of maps used by Rio Grande [Royalties] to purchase oil and gas minerals and royalty," (Dkt. No. 1 at ¶ 9); "(2) a claim for $1,200,000 worth of 'land title abstracts and land papers' which were used by Rio Grande [Royalties] in its landman/oil and gas business," (*Id.*); (3) "a proposal of $5,292.79 from Star2Star Communications to provide internet and phone service" for a 36-month term belonging to Upland Energy, another business Davis operates, (*Id.* at ¶ 16); (4) "legal bill[s] [amounting to] $930 from the Walker Keeling law firm" for work done by Davis's attorney with respect to reviewing a proposed third-party work contract to fix the Santa

Rosa Building, (Dkt. No. 1 at ¶ 18); and (5) "[an additional] claim for $60,000 for restoration worked performed by Servpro following Hurricane Harvey." (*Id.* at ¶ 17).

Since the Court has found that the Policy unambiguously provides full coverage to property related to Past Times, with her other property covered up to $10,000, it is easy to conclude that the first four items are not covered to the extent Davis desires. Because the maps, land title abstracts, and land papers used in Rio Grande Royalties' operations are not related to Past Times, those items are subject to the $10,000 coverage limit for Davis's personal effects by virtue of Rio Grande Royalties being a sole proprietorship without a separate identity from Davis.

Additionally, the proposed phone and internet subscription service is not covered by the Policy. Davis contends that the Policy covers these services as "telecommunications subscriptions" simply because Central previously paid for her copier and printer that were shared by all her businesses in the Santa Rosa Building and were destroyed during Hurricane Harvey. (Dkt. No. 24 at ¶ 26). She states that she does not understand why Central would pay for the copier and printer but not for the phone system her businesses also use. (*Id.*).

Regardless of whether the telecommunications subscription is for Past Times or Upland Energy, such subscriptions are not "Covered Property" unlike a copier or a printer. As the Policy states, coverage is extended to "Covered Property," which the Policy defines as, among other things, "furniture and fixtures," "machinery and equipment," "outdoor furniture" and "all other personal property owned by you and used in your business." (Dkt. No. 18-2 at 39). There is no mention of internet or phone

subscriptions as "Covered Property." (*Id.*). And as Central notes, "Covered Causes of Loss" is defined as "*direct physical loss* unless the loss is excluded or limited in this [P]olicy." (*Id.* at 75) (emphasis added). Davis does not cite to, and the Court cannot find, any portion of the Policy that states otherwise. The Policy does cover "loss, damage or expense caused by a failure or disruption of service," such as a loss of internet access or telecommunications services. (*Id.* at 118). But Davis does not claim that the $5,292.79 is a loss or damage she incurred due to an interruption. Rather, she wants Central to pay for her proposed three-year internet and phone service system and subscription. (Dkt. No. 24 at ¶ 25).

Similarly, Davis's legal fees item fails because the Policy does not cover the fees. Davis argues that fees are "covered as a special item and directly related to procuring labor and materials for remediation." (Dkt. No. 24 at 22). But she does not point to a Policy provision that states that such fees are "special items." As discussed, the policy unambiguously states that "Covered Property" includes tangible property in the Santa Rosa Building, such as "fixtures," "outdoor furniture," and "personal property," while "Covered Cause of Loss" is defined as "direct physical loss."[9] (Dkt. No. 18-2 at 39, 75). Given the Policy language, the $930 in legal fees are not covered, and Davis does not provide evidence establishing a genuine issue of material fact. With these claims resolved, the Court now turns to the last item, the ServPro restoration work.

---

9 The Policy even provides that in the context of "crime coverage," "[l]egal fees, costs and expenses incurred" "which are related to any legal action, except when covered under Forgery Or Alteration" are excluded. (*Id.* at 96).

### 3. <u>ServPro Restoration Work</u>

With respect to the insurance claim for restoration work by ServPro, a brief description of the events related to the restoration work following Hurricane Harvey is helpful. (Dkt. No. 24 at ¶ 22). After Hurricane Harvey, Davis contracted with ServPro to fix and restore the Santa Rosa Building for $86,000. (*Id.*); *see* (Dkt. No. 18-2 at ¶ 4). That amount was approved by Central, who paid the $86,000. (Dkt. No. 17 at 13); (Dkt. No. 18-3 at 85–86). Later, ServPro discovered that more work was needed to restore the Santa Rosa Building, which required additional cost beyond the original contract amount. (Dkt. No. 24 at ¶ 23); (Dkt. No. 19-2 at ¶ 20). Davis alleges that an "adjuster for Frost Insurance Agency and Central told [her] to do whatever needed to be done" to restore the building. (Dkt. No. 19-2 at ¶ 20). Given what she perceived as Central's go-ahead, Davis authorized and agreed to pay for the additional work. (*Id.*). The total amount ServPro ultimately charged was $145,987.49, a figure that includes the initial $86,000 amount contemplated by the original contract. (*Id.* at ¶ 21). Given these figures, Davis still owes $59,987.49 to ServPro.

Central has refused to pay more than the $86,000 already paid under the original contract. (*Id.*). Central proffers two arguments to justify its refusal. *See* (Dkt. No. 17 at 13); (Dkt. No. 32 at 4, 8); (Dkt. No. 34 at 22). First, Central argues that it is not liable for the additional restoration work because Davis's contract with ServPro limited the work expenses to $86,000, and any evidence that Davis offers to contradict the ServPro contract

is inadmissible.[10] (*Id.*). Regardless, Central argues it is not liable because ServPro has not sued Davis or demanded payment, and Davis has not paid the outstanding amount. (Dkt. No. 17 at 13).

Central's first argument is unpersuasive. Central does not cite, and the Court does not find, any Policy provision that even implies that Central is required to reimburse money only in accordance with the first estimate or work contract that Davis receives, agrees with, and enters into for restoration work. Hence, it is irrelevant that Davis initially entered into an $86,000 contract with ServPro and thereafter determined that more work was required. The Policy states that the "Limit of Insurance" for the Santa Rosa Building is $595,000. (Dkt. No. 18-2 at 9). This means that if the additional repairs are covered by the Policy and the value of those repairs did not exceed the $595,000 limit, Central would be fully liable for the work. As outlined in the Policy, Central uses a claims handling process to determine whether a claim is covered. (*Id.* at 15). During this process, Central investigates and appraises the damages claimed and ultimately issues payment based on either an agreement with Davis or an appraisal. (*Id.* at 68–70); *see also* (*Id.* at 15, 72–74). This process indicates that Central could conceivably be liable for the additional

[10] Central contends that the invoice from Servpro showing $145,987.49 due is hearsay. (Dkt. No. 32 at 4, 8); (Dkt. No. 34 at 22). Central also argues that Davis's affidavit stating that an insurance adjuster told her to do whatever was necessary to save the Santa Rosa Building is an attempt "to contradict the Servpro contract" which violates the parol evidence rule. (*Id.*). As discussed above, the Court sustains Central's objection to the Servpro invoice insofar as Davis offers such evidence to establish the true value of the repairs, but overrules the objection to the extent Davis offers the evidence to show what ServPro is charging her. The Court also overrules Central's parol evidence rule objection to Davis's affidavit alleging an oral agreement between Central and her, as discussed above.

repairs to the Santa Rosa Building up to $595,000, subject to an appraisal or agreement with Davis, regardless of the original ServPro work contract or any contractual modifications made to that agreement. Central does not allege that an appraisal was ever conducted or that the appraisal provision was invoked.

Central's second argument—that it is not liable for the outstanding amount because Davis has neither paid nor been sued by ServPro—is also unpersuasive. It is undisputed that Davis has not paid ServPro for the additional amount charged over $86,000 and that ServPro has not sued Davis. *See* (Dkt. No. 17 at 13); (Dkt. No. 24 at 22); (Dkt. No. 19-4). But ServPro *did* demand payment from her, sending Davis an invoice for the completed restoration work. (Dkt. No. 19-4). More importantly, Central does not cite, and the Court does not find, a specific Policy provision stating that Central would be liable for damages only if Davis pays for the repairs out of her own pocket or if a third-party contractor sues Davis to collect the bill. In fact, the factual allegations from both Parties establish that Central agreed to pay $86,000. If Central's assertion regarding its liability is correct, it could have refused to pay the initial amount since ServPro has not sued Davis.

To address Central's argument that the additional repairs are not covered, the Court must review the Policy language. The insurance limit for the Santa Rosa Building is $595,000. (Dkt. No. 18-2 at 9). As discussed, Central is liable up to that amount subject to the claims handling process found in the Policy. (*Id.* at 68–70); *see also* (*Id.* at 15, 72–74). Thus, for Central to be entitled to summary judgment, it must demonstrate that there is no dispute that the Policy does not cover Davis's expenses over $86,000. But Central does

not even attempt to do that.  It does not dispute that the Policy covers the type of damage Davis claims.  Central does not argue that the true value of the repairs is less than what Davis asks.  It does not contend that Davis did not follow the proper claim of loss process articulated in the Policy.  Indeed, Central has already paid $86,000, implying that it agrees it is liable for the damages, and whatever claims handling process Davis went through was adequate at least for that amount.

In sum, Central has failed to meet its burden that no genuine dispute of material fact exists as to whether the repair costs for ServPro's additional restoration work to the Santa Rosa Building are covered by the Policy.  Central's argument—that the Policy only covers the original $86,000 ServPro contract as demonstrated by the fact that ServPro has not sued Davis for the additional cost—is unpersuasive.  The Court cannot conclude as a matter of law that the additional repair costs are not covered by the Policy.

Davis has moved for summary judgment with respect to the same additional repair costs, contending that the Court should conclude as a matter of law that the Policy does cover the additional repair costs.  (Dkt. No. 22 at 6–7, 9, 15).  However, just as Central has failed to establish as a matter of law that the Policy *does not* cover the additional repair costs, Davis has failed to meet her burden to prove that the Policy *does* cover these costs as a matter of law.

As the party moving for summary judgment, Davis bears the burden of proof to show that the additional costs are covered.  *See Celotex Corp.*, 477 U.S. at 323, 106 S.Ct. at 2253.  The party who bears the burden of proof at the summary judgment stage "must establish beyond peradventure *all* of the essential elements of the claim or defense to

warrant judgment in his favor." *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986). "If the moving party fails to meet [her] initial burden, the motion [for summary judgment] must be denied, regardless of the nonmovant's response." *$92,203.00 in U.S. Currency*, 537 F.3d at 507 (quotation omitted).

Davis claims that the Policy covers the additional ServPro repair costs as a matter of law. She offers no evidence to show that Central determined coverage for the additional repair costs, nor has she cited any Policy provision that establishes coverage for these repairs. Instead, she argues that Central is required to cover the additional repair costs because an "adjuster for Frost Insurance Agency and Central told [her] to do whatever needed to be done to save the Santa Rosa Building[.]" (Dkt. No. 19-2 at ¶ 20). In support of this argument, Davis offers her own affidavit, (*Id.*), and an invoice from ServPro, (Dkt. No. 19-4).

An insurance company is generally liable for the conduct of its agents acting within the scope of their authority. *See Celtic Life Ins. Co. v. Coats*, 885 S.W.2d 96, 98 (Tex. 1994). While a representation by an insurance adjuster may bind the insurer in some cases, *see, e.g.*, *Hewett-Williams & Williams Const. Co. v. Capital Fire Ins. Co.*, 188 F.2d 241, 244 (5th Cir. 1951) (holding that the adjuster "had full authority" to adjust the loss), that is not always the case, *see* 3 Steven Plitt et al., *Couch on Insurance* § 48:64 (3d ed. Dec. 2021 Update) ("An adjuster cannot, of course, bind the insurer for a loss not covered by the policy."). While Davis's argument that the adjuster's statement is binding on Central could ultimately be correct, a host of questions remain before that conclusion can be established. Davis provides no evidence or authority to establish that this person was

authorized to bind Central, nor that this particular statement was sufficient to bind Central. Central raised this very objection in response to Davis's Motion. (Dkt. No. 32 at 4) ("This vague statement by an unnamed person . . . is not sufficient to bind Central[.]"). Thus, at the summary judgment stage, Davis has not "establish[ed] beyond peradventure" that the Policy covers the additional repair costs. *Fontenot*, 780 F.2d at 1194. The Court therefore finds that Davis's Motion for Summary Judgment is denied as to this item.

## IV. CONCLUSION

For the foregoing reasons, the Court **GRANTS IN PART** Central's Motion for Summary Judgment, (Dkt. No. 17). The Court grants Central summary judgment with respect to Davis's claims for (1) the maps, land title abstracts, and land papers used by Rio Grande Properties; (2) the internet and phone services for Upland Energy; and (3) the legal fees. The Court **DENIES** Davis's Motion for Summary Judgment, (Dkt. No. 22). The Court also **DENIES AS MOOT** the outstanding cross motions for summary judgment filed in Civil Action No. 6:19-CV-86, (6:19-CV-86, Dkt. No. 16); (6:19-CV-86, Dkt. No. 30).

It is SO ORDERED.

Signed on December 17, 2021.

Drew B. Tipton

**DREW B. TIPTON**
**UNITED STATES DISTRICT JUDGE**